UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NORMAN JOSEPH
JOHNSON,

                  Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

                  Defendant.

Case No. 2:20-cv-12482
District Judge David M. Lawson
Magistrate Judge Anthony P. Patti

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 15), GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 18), and AFFIRM THE COMMISSIONER'S DECISION

**I.    RECOMMENDATION**:  For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (ECF No. 15), **GRANT** Defendant's motion for summary judgment

(ECF No. 18), and **AFFIRM** the Commissioner's decision.

**II.    REPORT**

      Plaintiff, Norman Joseph Johnson, brings this action under 42 U.S.C. §§

405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security (Commissioner) denying his application for disability insurance (DI)

benefits.  This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (ECF No. 15), the Commissioner's cross-motion for summary judgment (ECF No. 18), and the administrative record (ECF No. 11).

### A.   Background and Administrative History

Plaintiff alleges his disability began on September 30, 2017, at the age of 54. (ECF No. 11, PageID.163.)  In his disability report, he lists several conditions (chronic severe central sleep apnea (CSA) with bruxism, chronic severe obstructive sleep apnea (OSA), hypertension, enlarging heart, allergies, high cholesterol, diverticulosis, irritable bowels (cancer removed), acid reflux, heartburn, headache, eczema, and psoriasis) as limiting his ability to work.  (*Id*., PageID.218.)  His application was denied in July 2018.  (*Id*., PageID.103-121.)

Plaintiff requested a hearing by an Administrative Law Judge (ALJ).  (*Id*., PageID.122.)  On August 21, 2019, ALJ Michael F. Schmitz held a hearing, at which Plaintiff and a vocational expert (VE), Michael E. Rosko, testified.  (*Id*., PageID.66-94, 276-277, 283.)  On September 9, 2019, ALJ Schmitz issued an opinion, which determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id*., PageID.50-64.)

Plaintiff submitted a request for review of the hearing decision/order.  (*Id*., PageID.156-159.)  However, on July 20, 2020, the Appeals Council denied Plaintiff's request for review.  (*Id*., PageID.39-44.)  Thus, ALJ Schmitz's decision

became the Commissioner's final decision.  Plaintiff timely commenced the instant action on September 10, 2020.  (ECF No. 1.)

## B.    Plaintiff's Medical History

The administrative record contains approximately 169 pages of medical records, which were available to the ALJ at the time of his September 9, 2019 decision.  (ECF No. 11, PageID.64, 284-452 [Exhibits 1F-9F].)  These materials will be discussed in detail, as necessary, below.

## C.    The September 9, 2019 Administrative Decision

Pursuant to 20 C.F.R. § 404.1520(a)(4), at **Step 1** of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 30, 2017, the alleged onset date (AOD).  (ECF No. 11, PageID.55.)  At **Step 2**, the ALJ found that Plaintiff had the following severe impairments:  OSA; CSA; and psychophysiological insomnia.  (*Id*., PageID.55-57.)  At **Step 3**, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (*Id*., PageID.57.)  **Between Steps 3 and 4** of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity (RFC)[1] and determined that Plaintiff had the RFC:

---

[1] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.

3

. . . to perform medium work [*i.e., exertional limitations*] . . . with additional limitations, as follows:  Never climb ladders, ropes, scaffolds; frequently climb ramps/stairs, balance, stoop, kneel, crouch and crawl [*i.e., postural limitations*]; needs to avoid concentrated exposure to noise; needs to avoid all exposure hazards, such as unprotected heights, moving mechanical parts, and operation of motor vehicles; and needs to avoid concentrated exposure to rough, uneven, slippery, shifting, or obstructed terrain [*i.e., environmental limitations*].

(*Id*., PageID.57-59.)  At **Step 4**, the ALJ determined that Plaintiff was capable of performing past relevant work as a logistics engineer.  (*Id*., PageID.59-61.)  Then, in an alternative **Step 5** finding, the ALJ determined that, considering Plaintiff's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Plaintiff also could perform.  (*Id*.) The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from September 30, 2017 through the date of the decision.  (*Id*., PageID.61.)

## D.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal

---

20 C.F.R. §§ 404.1545(a), 416.945(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see*

*also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as

to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under

this standard, "[s]ubstantial evidence is defined as 'more than a scintilla of

evidence but less than a preponderance; it is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241

(quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).  In deciding whether substantial evidence supports the ALJ's decision, the

Court does "not try the case de novo, resolve conflicts in evidence, or decide

questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);

*Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court,

to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial.

The Court must "'take into account whatever in the record fairly detracts from

[the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384,

395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487

(1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this

Court defers to that finding 'even if there is substantial evidence in the record that

would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*,

581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273

(6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence

standard, "'a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the

merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651

(quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### E.    Analysis

Although Plaintiff presents a single statement of error, it has two

components – one challenging the ALJ's treatment of the opinion evidence (*see* 20

C.F.R. § 404.1520c, SSR 96-8p) and the other challenging the ALJ's treatment of

Plaintiff's symptoms (*see* 20 C.F.R. § 404.1529, SSR 16-3p).  (ECF No. 15,

PageID.460, 469-476.)

### 1.    Opinion evidence

### a.    Opinions of non-treaters

The ALJ explained he was persuaded by the prior administrative findings in

regard to Plaintiff's overall physical and mental health – *i.e.*, state agency medical

consultant R. H. Digby, M.D.'s July 27, 2018 opinion (*id.*, PageID.106, 110-111)

and state agency psychological consultant William Norton, Ph.D.'s July 30, 2018

opinion (*id.*, PageID.108-109) – and by the July 17, 2018 consultative examination

report, which was signed by John J. Jeter and Hugh Bray, Ph.D. (*id*., PageID.355-360).  (*Id*., PageID.58-59.)

Plaintiff claims "the opinions of the consultative examiners, who opined that there was no evidence of mental or psychological impairments[,]" are "not relevant to Plaintiff's severe sleep apnea[.]"  (*Id*., PageID.473.)  Presumably, Plaintiff is referring to:  (1) Dr. Norton's statement that "there is no evidence in support of allegations of a mental MDI," (*id*., PageID.108); and/or, (2) the Jeter / Dr. Bray opinion that "[t]here is no apparent mood disorder[,]" and representation that Plaintiff "[d]enies any mental health problems[,]" (*id*., PageID.359).

In any event, the Commissioner correctly notes that the RFC's exertional limitation to medium work and environmental limitations (ECF No. 11, PageID.57) are consistent with the state agency medical consultant Dr. Digby's physical RFC assessment (*id*., PageID.106, 110-111).  (ECF No. 18, PageID.506.)  Indeed, in finding Dr. Digby's opinion persuasive, the ALJ expressly noted:  "The findings are supported by the record that was available to him for his review in July 2018 and are consistent with the few physical limitations that had been attributed to his having obstructive sleep apnea."  (ECF No. 11, PageID.58-59.)  *See* 20 C.F.R. § 404.1520c(c)(1),(2).

**b.    Opinion of treating physician (Kenneth Colton, D.O.)**

The ALJ was *not persuaded* by the opinion of Kenneth Colton, D.O. of Michigan Family Physicians, P.C.  (*Id*., PageID.59.)  By way of background, Dr. Colton represents that Plaintiff has been an "office patient since 2008" (*id*., PageID.447); however, the medical evidence of record (MER) only contains treatment records with Dr. Colton or his practice from February 2017 to June 2019. (ECF No. 11, PageID.38, 284-347 [Ex. 1F], 417-438 [Ex. 7F].)  The ALJ cited some of these records at Step 2 and again within the RFC discussion.  (ECF No. 11, PageID.56, 58.)

In an August 2, 2019 sleep disorders RFC questionnaire, when asked to addresses certain environmental and social interaction limitations, Dr. Colton wrote, "intellectual impairment issue – <u>not</u> physical[.]"  (*Id*., PageID.449 (emphasis in original).)  Dr. Colton did not assess exertional limitations, but he did opine that Plaintiff would have several non-exertional limitations.  (*Id*.)  As to Dr. Colton's medical source statement (MSS), the ALJ noted:

> The physician provided the opinion in 2019 and indicated that he had been treating the claimant since 2008.  The physician opined on a Sleep Disorders Residual Functional Capacity Questionnaire that the claimant's symptoms include excessive daytime sleepiness and disturbance in cognitive function, fatigue, and memory impairment and that the claimant has the non-exertional limitations of maintaining attention for only two-hour segments, understanding / remembering / carrying-out only simple instructions, and would be absent more than four times per month.  However, the opinion is *not supported by* the physician's treatment notes, such as indicating on May 29, 2019 that "memory intact...intellectual functioning mildly impaired" and *not consistent with* the rest of the record, which does not contain mental

8

health treatment measures, such as counseling or multiple mental-related medications.

(ECF 11, PageID.59 (emphases added).)

### c.   Relationship

Plaintiff challenges the ALJ's consideration of the treatment relationship factor. *See* 20 C.F.R. § 404.1520c(c)(3). Plaintiff claims that Dr. Colton "has had the longest treatment relationship with Plaintiff[,]" and "is . . . in the best position to render an opinion as to Plaintiff's medical condition and longitudinal treatment history." (*Id*., PageID.473; *see also id*., PageID.475.) However, the ALJ at least implicitly considered this factor when he acknowledged that Dr. Colton "had been treating the claimant since 2008." (ECF No. 11, PageID.59.) Likewise, having referred to the state agency consultants' opinions as "administrative medical findings" or the consultative examiner(s) as "[t]he evaluating psychological consultant," (*id*., PageID.58-59), the ALJ certainly knew that none of them "had as extensive a treatment history as [did] Dr. Colton," (ECF No. 15, PageID.475).

### d.   Supportability

Plaintiff challenges the ALJ's statement that Dr. Colton's opinion "is not supported by the physician's treatment notes, such as indicating on May 29, 2019 that "memory intact...intellectual functioning mildly impaired . . . ." (ECF No. 11, PageID.59). (ECF No. 15, PageID.473, 475.) "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to

9

support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  Indeed, Dr. Colton's May 2019 progress notes reflect that Plaintiff's intellectual functioning was "mildly impaired" and "appropriate however slow[,]" and he suspected "there may be a link between injury and difficulty with drowsiness as well as focusing."  (ECF No. 11, PageID.422.)

To the extent Plaintiff notes the ALJ's citation to "a single instance from Dr. Colton's notes . . . [,]" (ECF No. 15, PageID.473), the Commissioner contends "the record is replete with findings similar to the ones specifically mentioned by the ALJ," and provides several record citations.  (ECF No. 18, PageID.503, 508.)  Thus, even though there were instances of being "slow to respond" or answer and/or abnormal affect (*id.*, PageID.331, 422, 427, 434) and reports of "energy level somewhat reduced" and "daytime headaches and drowsiness" (*id.*, PageID.323, 329), there were also references to:

- "[i]ntact memory, judgement and insight, normal mood and affect[,]" and "[s]peech normal rate and tone[,]" in February 2017 (*id.*, PageID.325);

- subjective reports of "negative . . . fatigue," and "negative disorientation / confusion, . . . impaired recent memory, impaired remote memory[,]" in February 2017 (*id.*, PageID.323);

- "appropriate" intellectual functioning in February 2018, November 2018, and March 2019 (ECF No. 11, PageID.331, 434, 427); and,

- a denial of fatigue in January 2019 (*id.*, PageID.429).

(ECF No. 18, PageID.503, 508.)  The Commissioner sensibly contends that findings of intact memory and only mildly impaired intellectual functioning "cut directly against" Dr. Colton's opinions that Plaintiff would have serious limitations with "understand[ing], remember[ing] and carry[ing] out simple instructions," "maintain[ing] attention for two hour segments," "perform[ing] at a consistent pace," and "deal[ing] with normal work stresses[,]" (ECF No. 11, PageID.449). (ECF No. 18, PageID.501-502.)

More importantly, Plaintiff claims the May 29, 2019 notes are not relevant to "Plaintiff's severe sleep apnea" – *i.e.*, his severe OSA and severe CSA (ECF No. 15, PageID.473) and contends that Dr. Colton assessed functional limitations "directly associated with Plaintiff's sleep impairments."  (ECF No. 15, PageID.474.)  The August 2, 2019 MSS appears to state that sleep apnea without BiPAP reduces sleep to 3-4 hours per night, resulting in broken daytime sleepiness (2-3 daily naps, 30-40 minutes each) and insomnia (difficulty falling asleep, lasting 30-60 minutes).  (ECF No. 11, PageID.447.)  Also, with regard to treatment and response, the MSS states that the BiPAP device improved sleep and that sertraline (Zoloft®), "given to control anxiety," contributes to daytime drowsiness.  (*Id.*,

11

PageID.448.)  As for prognosis, Dr. Colton wrote "[f]air – continues with daytime

drowsiness and napping[,] working with pulmonary specialist to improve quality of

sleep[.]"  (*Id.*)  And, the MSS notes that Plaintiff would have limitations "on

focusing, performing engineering duties, sitting for long periods at

desk/computer," and "completing prescribed tasks in [an] allotted time period[.]"

(*Id.*, PageID.550.)

However, notwithstanding Plaintiff's "emphasis on the physical nature of his

sleep apnea impairment," the Commissioner convincingly contends that the

aforementioned records are "highly probative evidence that undercut[s] Plaintiff's

plea for limitations to his ability to concentrate, deal with stress, remember

instructions, and perform at a consistent pace," and the "resulting limitations"

Plaintiff alleges are "mental and cognitive in nature[.]"  (*Id.*, PageID.503-504.)  In

sum, Plaintiff has not shown error in the ALJ's supportability statement.

### e.   Consistency

Plaintiff challenges the ALJ's statement that Dr. Colton's opinion is "not

consistent with the rest of the record, which does not contain mental health

treatment measures, such as counseling or multiple mental-related medications[,]"

(ECF No. 11, PageID.59).  (ECF No. 15, PageID.473, 475.)  "The more consistent

a medical opinion(s) or prior administrative medical finding(s) is with the evidence

from other medical sources and nonmedical sources in the claim, the more

persuasive the medical opinion(s) or prior administrative medical finding(s) will

be." 20 C.F.R. § 404.1520c(c)(2).

To bolster the argument that Dr. Colton's MSS is supported by and

consistent with the evidence of record, Plaintiff points to:

- Lisa Shives, M.D.'s February 6, 2018 apnea analysis, which revealed "evidence of severe sleep apnea" (ECF No. 11, PageID.398);

- The May 16, 2019 notes of Robert Grant, D.O., to whom Plaintiff reported sleeping 5 or 5.5 hours per day and taking "an hour and a half nap during the day," seemingly while using his BiPAP mask, which was "fitting okay" (*id*., PageID.414);

- The June 14, 2018 polysomnography report, in which Dr. Grant – who noted Plaintiff's history of severe OSA and who reviewed the digital data "epoch by epoch" – found, *inter alia*, that "sleep latency was 7.3 minutes, which was representative of hypersomnia[,]" and "REM latency short at 73 minutes with 20 awakenings at least one epoch[,]" (*id*., PageID.439, 373, 386); and,

- The November 15, 2018 notes of Dr. Grant, to whom Plaintiff reported he was "still sleepy[,]" (*id*., PageID.411).

(ECF No. 15, PageID.474-475.) Plaintiff claims this evidence supports the

functional limitations opined by Plaintiff's treating physician" with respect to

"Plaintiff's sleep apnea and insomnia." (*Id*., PageID.475.)

True, Dr. Colton assesses several non-exertional limitations in his "Sleep

Disorders Residual Functional Capacity Questionnaire." (ECF No. 11,

PageID.449-450.) Yet, notwithstanding Dr. Colton's diagnoses of "mood disorder

with major depressive-like episode due to general medical condition" (*id.*,
PageID.418) and "generalized anxiety disorder" and/or "mild major depression"
(*id.*, PageID.427, 431, 434), the ALJ:  (i) at Step 2, noted that Plaintiff's mood
disorder, depression, and anxiety disorder were "secondary to the claimant's severe
physical impairments and from him taking care of his mother and are treated and
controlled with medications, such as Zoloft/Sertraline[,]" (ECF No. 11,
PageID.56); and, (ii) within the ALJ's RFC discussion, concluded that the MSS
was "not consistent with the rest of the record, which does not contain mental
health treatment measures, such as counseling or multiple mental-related
medications[,]" (ECF No. 11, PageID.59).

Setting aside, for the moment, the *cause* of Plaintiff's sleep issues and
fatigue, Plaintiff's *treatment* records are limited to Michigan Family Physicians
(Exhibits 1F and 7F), sleep specialist Dr. Grant (Exhibits 2F, 4F, 6F), and the
Sleep Disorders Center of Michigan (Exhibits 5F and 8F).  In other words, Plaintiff
does not appear to have been treated by a psychologist or psychiatrist.  Also, while
Dr. Colton assessed certain non-exertional limitations (ECF No. 11, PageID.449-
450), the consultative examination report summary reflects "no apparent mood
disorder[,]" "no difficulty comprehending and carrying out simple directions," "no
difficulty performing repetitive, routine, simple tasks," and "no difficulty

14

comprehending complex tasks[,]" (ECF No. 11, PageID.359).  In sum, Plaintiff has not shown error in the ALJ's consistency statement.

### 2.  Symptoms

Plaintiff contends that the ALJ "oddly does not include any symptoms or functional limitations" associated with the impairments – OSA, CSA, and psychophysiological insomnia – he found to be severe at Step 2.  (ECF No. 15, PageID.469.)  At issue in this appeal are Plaintiff's alleged symptoms regarding sleep and energy, such as "inability to sleep at night," "poor sleep quality," "daytime sleepiness," "feelings of jet lag in the mornings," and decreased energy (*id*., PageID.469-470), as well as tiredness, drowsiness, "wak[ing] during the night," and "disruption to his sleep routine," (*id*., PageID.476).  Plaintiff claims that the evidence supports his complaints of "very limited sleep," "the quality of sleep is very poor[,]" and "wake time is like jet lag, only there was no flight[,]" (*id*., PageID.240, 247).  (ECF No. 15, PageID.475.)

Plaintiff's symptoms-related argument challenges the ALJ's treatment of his daily activities and medication side effects.

### a.  Daily activities

Plaintiff claims that the ALJ's consideration of activities of daily living "does not provide sufficient grounds for disregarding the functional limitations opined by Plaintiff's treating physician."  (ECF No. 15, PageID.470.)  *See* 20

C.F.R § 404.1529(c)(3)(i).  At the administrative hearing, Plaintiff was asked if "with the lack of sleep" he has "to compensate during the day with naps."  (ECF NO. 11, PageID.77.)  He responded, "I've been advised to not nap during the day because it makes it worse at night."  (*Id.*)  This is consistent with the Jeter/Bray consultative report, which states, "He does not nap."  (*Id.*, PageID.357.)  When asked what he does to keep himself from drifting into naps, Plaintiff explained, "I busy myself as much as possible with household work[,]" and other activities, including:  watching movies, pulling weeds, and going for "short walks[,]" explaining that he tries "to go for a walk in the morning."  (*Id.*, PageID.77-78.)  He also washes dishes, does laundry, cooks, and cuts the grass.  (*Id.*, PageID.78.)  He explained that he does these activities "in short bursts."  (*Id.*, PageID.78-80.)

Within the September 9, 2019 written decision, at Step 2, the ALJ found Plaintiff to have "mild limitation" in each of the functional areas – *i.e.*, "understanding, remembering or applying information," "interacting with others," "concentrating, persisting or maintaining pace," and "adapting or managing oneself."  (ECF No. 11, PageID.56-57.)[2]  In so doing, the ALJ noted, *inter alia*,

---

[2] The state agency medical consultant(s) evaluated Plaintiff's symptoms, namely, pain and limitations in the functional areas – *i.e.*, understanding and memory, sustained concentration and persistence, social interaction, and ability to adapt – and determined that "[Plaintiff] would have some restrictions due to [his] conditions / [symptoms][,]" but also that "the [medical evidence of record] and [activities of daily living] info[rmation] is not consistent with [his] statements re[garding] [symptom] severity/limitations."  (ECF No. 11, PageID.109-110.)

that "[t]he claimant lives in a house with his wife and two teenaged children[,]"

"[h]e stays busy around the house by performing normal household chores, such as

cooking and cleaning, and outside chores, such as mowing, but does one chore at a

time, then rests before doing something else[,]" and "[h]is spouse does the laundry

and other chores." (*Id*.) The ALJ supported these statements with general citations

to the hearing testimony (*see* ECF No. 11, PageID.66-94), Plaintiff's June 30, 2018

function report (*id*., PageID.240-247), and the July 17, 2018 consultative

examination report, which was signed by John J. Jeter and Hugh Bray, Ph.D. (*id*.,

PageID.355-360). (ECF No. 11, PageID.57.)

### i.    OSA and CSA

Within the RFC determination, when addressing Plaintiff's OSA and CSA,

the ALJ cited Plaintiff's report that "he is unable to sleep at night, which results in

him having daytime sleepiness . . . [,]" – for which the ALJ cited Dr. Colton's

August 2, 2019 MSS (*id*., PageID.447), although "excessive daytime sleepiness"

and "disruptive snoring" were noted in a February 5, 2018 medical order (*id*.,

PageID.287) and "daytime sleepiness" was noted in April 23, 2018 notes from Dr.

Colton's office (*id*., PageID.339) – *in comparison to* Plaintiff's admission "to

being able to manage a household with his wife and be active throughout the day . .

. ." (ECF No. 11, PageID.58.)

Plaintiff claims the ALJ provided a "cursory dismissal," which "does not demonstrate due consideration for the evidence of record," and also contends that "the ALJ cites no other evidence to challenge Plaintiff's reported symptoms." (ECF No. 15, PageID.469.)  However, as the Commissioner correctly notes, Plaintiff overlooks the ALJ's aforementioned discussion of Plaintiff's daily activities when addressing the four functional areas at Step 2 (ECF No. 11, PageID.56-57).  (ECF No. 18, PageID.508-509.)

### ii.   Psychophysiological insomnia

When addressing Plaintiff's psychophysiological insomnia, which was among Dr. Grant's May 29, 2018 diagnoses (ECF No. 11, PageID.383), the ALJ cited, albeit without dates:  (a) Plaintiff's June 30, 2018 report of "very limited sleep," "the quality of sleep is very poor[,]" and "wake time is like jet lag, only there was no flight[,]" (*id*., PageID.240); *in comparison to*, (b) Plaintiff's March 4, 2019 admission to Dr. Colton that he "is going to the gym 3 days a week doing a mixture of cardio and weights[,]" (*id*., PageID.424).  (ECF No. 11, PageID.58.)[3]

Plaintiff claims "this does not present a complete picture of Plaintiff's condition[,]" and directs the Court's attention to:  (i) Dr. Colton's June 15, 2018

---

[3] The ALJ appears to have made a typographical error, because exact record the ALJ cites is Ex. 7F/1 (ECF No. 11, PageID.417), which references Dr. Colton's June 20, 2019 notes, instead of Ex. 7F/8 (*id*., PageID.424), which references Dr. Colton's March 4, 2019 notes containing the content to which the ALJ refers.  (*See* ECF No. 11, PageID.58.)

notes, which reflect that Plaintiff "continues to workout [sic] at the gym 2-3 days weekly but feels that his energy level is subpar and it affects his work out[,]" (ECF No. 11, PageID.435); and, (ii) Dr. Colton's June 20, 2019 notes, which reflect exercise of "occasional walking," (*id.*, PageID.417). (ECF No. 15, PageID.470.) As Plaintiff puts it, "[t]his suggests a struggle and then decrease in energy levels year-over-year." (*Id.*)

However, there is evidence to support the ALJ's above-mentioned characterization of his psychophysiological insomnia. For example, Dr. Colton's March 4, 2019 record also states:

> Patient continues to have some difficulty with sleeping. He is currently wearing BiPAP provided by Dr. Grant. States he is now getting 7-8 hours of rest however this is still interrupted. Patient states that since utilizing sertraline, sleep seems to be somewhat more continuous. Patient currently taking 75 mg at nighttime. Would like to increase that dosage. Patient continues to have some anxiety issues. Is not currently seeing a counselor. Had seen on[e] previously when court mandated for family issues.

(ECF No. 11, PageID.424). Also, even though he testified in August 2019 that he tries to "go for a walk in the morning" to "get some oxygen in my head," (ECF No. 11, PageID.78), he also testified that "if I felt I could drive the kids to school instead of taking the bus on a rainy day or whatever, I would go to the gym [close to the high school] and use the elliptical and I, I liked the elliptical because it was less pressure[,]" (*id.*, PageID.81.)

In Plaintiff's case, the Commissioner persuasively asserts that the ALJ's observations about Plaintiff's daily activity undercut his "alleged cognitive limitations, including difficulty with focus, attention, concentration, and task persistence."  (ECF No. 18, PageID.507-508.)  *See*, *e.g.*, *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 441-442 (6th Cir. 2017) ("It was entirely appropriate for the ALJ to consider whether Shepard's asserted limitations were consistent with her ability to drive, prepare simple meals, shop, and go to eat or the movies."). This assertion is buttressed by the ALJ's apparent citations to:  (i) Plaintiff's function and consultative reports, wherein he represented he was "capable" of following written and spoken instructions, suggests he re-prioritizes when there are changes in routine, and describes a litany of household and social activities, including, *inter alia*, watching TV, reading, socializing with family, attending the theatre, going to the mall, running errands, going with his mother to the doctor and to activities with his kids, cooking simple meals, shopping, and housekeeping (ECF No. 11.PageID.244-246, 357); and, (ii) his administrative hearing testimony that he "would spend time away from the desk doing meditation or anger management exercises to try to get through the day," (*id*., PageID.76). Consistently,  the ALJ observed that Plaintiff "is able to follow written/spoken instructions, uses meditation and exercise to handle stress, and reprioritizes when experiencing changes in routine."  (ECF No. 11, PageID.57.)

20

**b.   Medication side effects (*i.e.*, daytime drowsiness)**

Plaintiff claims that the ALJ "does not address the side effects of Plaintiff's

medication on his ability to stay alert[.]"  (ECF No. 15, PageID.476 (emphasis

added).)  *See* 20 C.F.R. 404.1529(c)(3)(iv).  Within the administrative record, there

is evidence of Plaintiff's medication – such as CPAP, BiPAP, Zoloft (sertraline) –

and alleged side effects.  (ECF No. 11, PageID.77, 220-221, 406, 247, 260.)[4]

The ALJ acknowledged Plaintiff's use of medication within the September

2019 written decision.  At Step 2, the ALJ acknowledged that Plaintiff's "mood

disorder, depression, and anxiety disorder" were "secondary to the claimant's

severe physical impairments and from him taking care of his mother . . . [,]" and

"are treated and controlled with medications, such as Zoloft/Sertraline . . . [,]" in

support of which the ALJ cited records dated November 2018 (*id*., PageID.432),

January 2019 (*id*., PageID.431), March 2019 (*id*., PageID.426-427), and June 2019

(*id*., PageID.418).  (ECF No. 11, PageID.56.)  Then, within the RFC discussion,

the ALJ discounted Dr. Colton's August 2, 2019 sleep disorders RFC questionnaire

(*id*., PageID.447-450), in part because it was "not consistent with the rest of the

record, which does not contain mental health treatment measures, such as

---

[4] "The primary side effects of sertraline include syncope, lightheadedness,
diarrhea, nausea, sweating, dizziness, xerostomia, confusion, hallucinations,
tremor, somnolence, impotence, a disorder of ejaculation, fatigue, rhinitis, and
female sexual disorder."  (*See* https://www.ncbi.nlm.nih.gov/books/NBK547689/
(last visited Feb. 1, 2022.)

counseling or *multiple* mental-related medications." (ECF No. 11, PageID.59 (emphasis added).)

To be sure, "[s]ertraline is a medication used to manage and treat . . . major depressive disorder, obsessive-compulsive disorder, panic disorder, post-traumatic stress disorder, premenstrual dysphoric disorder, and social anxiety disorder[,]" (*see* https://www.ncbi.nlm.nih.gov/books/NBK547689/ (last visited Feb. 1, 2022). However, it appears that, in November 2018, Dr. Colton recommended "possibility of patient taking anxiety medication to help not only with sleep but also with irritable bowel[,]" and issued a prescription for 25 mg at bedtime. (ECF No. 11, PageID.434.) In January 2019, Dr. Colton increased the prescription to 50 mg nightly. (ECF No. 11, PageID.431.) Zoloft was continued in May 2019 (*id.*, PageID.423) and, in June 2019, Plaintiff "continue[d] to be satisfied with Zoloft as it provides significant mood stability *and allows patient to have satisfactory lifestyle*." (*Id.*, PageID.417 (emphasis added).)

To the extent Plaintiff's side-effects argument is based on Dr. Colton's opinion that sertraline, "given to control anxiety," contributes to "daytime drowsiness[,]" (*id.*, PageID.448 & ECF No. 15, PageID.474), the Commissioner points to the January 2019 notes from Dr. Colton, to whom Plaintiff reported that "Zoloft initially helped with anxiety but then symptoms returned[,]" and he was "*taking medication at nighttime*," which "*will generally help him fall asleep*,"

22

however, "he will wake up 3-4 hours later feeling very anxious[,]" (ECF No. 11, PageID.429 (emphases added)).  (ECF No. 18, PageID.505.)  Also, the Commissioner points to the same records as evidence that Zoloft caused "some mild GI side effects and increased frequency of stool . . . [,]" and Dr. Colton explained "the GI side effects would likely resolve[,]" (ECF No. 11, PageID.429, 431).  (ECF No. 18, PageID.505-506; *see also id.*, PageID.510.)

Yet, Plaintiff's side effects argument is not focused on his use of Zoloft / sertraline; instead, Plaintiff's argument about the effects of his medication upon his "ability to stay alert" seems to be based upon:  (a) Dr. Grant's May 16, 2019 notes, which reflect Plaintiff's report of sleeping 5 or 5.5 hours per day and taking "an hour and a half nap during the day," seemingly while using his BiPAP mask, which was "fitting okay" (*id.*, PageID.414); and, (b) Dr. Colton's May 28, 2019 notes, when Plaintiff presented for follow-up regarding "difficulty with sleeping as well as daytime drowsiness[,]" (ECF No. 11, PageID.420).  (ECF No. 15, PageID.476.)  Still, even though the ALJ did not use the words "side effects" in the written decision, the ALJ unquestionably considered Plaintiff's report of "his waking hours feeling like jet lag" and Dr. Colton's assessment of "excessive daytime sleepiness."  (ECF No. 11, PageID.58-59, 240, 447.)

### c.    Accounting for Plaintiff's symptoms

Plaintiff claims the ALJ's decision "does not reflect due consideration for the effects of symptoms associated with severe sleep apnea and insomnia on Plaintiff's ability to perform[] sustained work on a regular and continuing basis[,]" *i.e.*, "8 hours a day, for 5 days a week, or an equivalent work schedule." (*Id.*, PageID.475; SSR 96-8p, 1996 WL 374184, *1 (July 2, 1996).) However, when arguing that the ALJ "accounted for Plaintiff's sleep impairments in the RFC[,]" the Commissioner correctly noted, as reflected above, that the RFC's exertional limitation to medium work and environmental limitations (ECF No. 11, PageID.57) are consistent with the state agency medical consultant Dr. Digby's physical RFC assessment (*id.*, PageID.106, 110-111). (ECF No. 18, PageID.506.) And, the ALJ found that opinion "consistent with the few physical limitations that had been attributed to his having [OSA]." (ECF No. 11, PageID.59.) Plaintiff having failed to illustrate reversible error in the ALJ's treatment of daily activities or medication side effects, and given the record on these issues discussed throughout the ALJ's opinion and as recounted in this report, the RFC should be affirmed.

## F.      Conclusion

Plaintiff has the burden of proof on his statement(s) of error. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) ("[D]uring the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner

only at Step Five."). Plaintiff has not shown legal error in the ALJ's RFC determination. Accordingly, for the foregoing reasons, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (ECF No. 15), **GRANT** Defendant's motion for summary judgment (ECF No. 18), and **AFFIRM** the Commissioner of Social Security's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.* Any objection must precisely recite the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an

25

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.*  If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated:  February 8, 2022                   s/*Anthony P. Patti*
                                           Anthony P. Patti
                                           UNITED STATES MAGISTRATE JUDGE